UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JEFFREY S. BAGNELL,                  :        CIVIL ACTION NO.:
JEFFREY S. BAGNELL, ESQ., LLC,       :
                                     :
        Plaintiffs,                  :
                                     :
v.                                   :
                                     :
SIG SAUER, INC.,                     :
                                     :
        Defendant.                   :        JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs, by and through undersigned counsel, states the following for their Complaint

against defendant Sig Sauer, Inc. "("Sig" or "defendant"):

## PARTIES

1.      Plaintiff Jeffrey S. Bagnell is an individual residing in the State of Connecticut and is

a licensed attorney.  Plaintiff Jeffrey S. Bagnell, Esq., LLC is his single member LLC.

2.      Defendant Sig is a Delaware corporation with a principal place of business in New

Hampshire and does business in the State of Connecticut.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper under 28 U.S.C. § 1332(a) because the amount in controversy

exceeds $75,000 and there is complete diversity of citizenship.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the

defamatory publication was accessed in Connecticut, and Plaintiff Bagnell resides and

practices law in this District.

## FACTUAL BACKGROUND

5.      On or about March 7, 2025, defendant Sig published a mendacious public statement on its Instagram, Facebook and public website pages titled "The Truth About the P320" (the "Statement"). Ex. 1.

6.      This Statement was not issued in relation to any civil action filed by Sig; it was instead a standalone release to the public.

7.      The Statement referred to individuals involved in litigation over the P320 pistol, including "trial attorneys," and accused them of making "baseless allegations," being "engagement hacking grifters," "misrepresenting" facts, spreading "lies" and "misinformation," "nothing more than individuals seeking to profit," and "highjackers" (sic) of "the truth for profit."

8.      In a word, the Statement calls plaintiff Bagnell, and other attorneys advocating on behalf of P320 victims, dishonest and unethical.  This is libel *per se* - - attributing improper conduct and a lack of integrity in one's trade or profession to the public.

9.      Plaintiff Bagnell is a trial attorney who since June 2017 has represented and currently represents federal and state law enforcement and civilian clients in active litigation against Sig involving the P320 pistol.  He is reasonably understood by the public to be one of the attorneys, if not the primary attorney, referenced in the post.

10.      He has practiced for 32 years with no substantive discipline of any kind his entire career.  He has received numerous peer reviewed honors and awards.

11.      He is the first attorney in the nation to bring Sig to trial for a defective discharge of a P320 that severed his client Deputy Sheriff Marcie Vadnais's femur in half in February 2018.

12.      Instead of taking a verdict in that case on the grounds that it is "impossible" for the P320 to malfunction and is some kind of perfect machine, Sig settled it on the second day of a jury trial in the Eastern District of Virginia.

*Vadnais v. Sig Sauer, Inc.*, 1:18-cv-00540 (EDVA).  Its earlier summary judgment and Daubert

motions had been summarily denied from the bench.

13.    Previously in this District, Sig settled a case involving Bagnell's client Vincent Sheperis, a

Stamford SWAT officer whose P320 drop fired from three feet despite Sig's assurances that the P320

was drop safe.  The bullet struck Sheperis in his knee.  *Sheperis v. Sig Sauer, Inc*., 3:17-cv-01318 (D.

Conn.).

14.    Defendant knew, at the time of publication of the Statement, of these and at least fifteen other

lawsuits filed across the country alleging that the P320 can discharge without a trigger pull.  Many of

these lawsuits survived dispositive summary judgment and Daubert motions, were settled, and

involved sworn testimony and expert reports contradicting Sig's blanket "impossibility" claim.

15.    In fact, before Sig issued the Statement, it was fully aware that a federal judge had

already found, in September 2022, that the assertion that it is impossible for the P320 to fire

without a trigger pull was "unpersuasive" after a week-long jury trial:

> *"The court found Guay credible in every respect.  Specifically, the court credits Guay's testimony that the gun was still fully inside the holster when it discharged.  With the gun fully in the holster, Guay could not have accessed the trigger; it would have been impossible for him to have accidentally pulled it.  Moreover, as expert testimony revealed, the P320 had a 6.7 pound trigger, meaning that to fire, the user had to exert 6.7 pounds of pressure.  The court does not believe that Guay could have applied that amount of force to the trigger inadvertently while the gun was in the holster".*
>
> . . .
>
> *To the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive. As discussed, the court found credible Guay's testimony that he did not pull the trigger, and the video of the Roscommon incident was persuasive in showing that a P320 can fire without a trigger pull. Furthermore, Watkins admitted that—despite having read the numerous allegations of misfires (without a trigger pull) in the complaint—he did not deem them worthy of mention in his expert report. And Toner testified that he found such misfire allegations unworthy of investigation. Had Watkins and Toner been less dismissive of these allegations, the court may have found their testimony more credible.*

*Guay v. Sig Sauer, Inc*., 626 F. Supp. 3d 536, fn. 2. (D. NH)

16.    In June and November 2024, a federal and state juries returned $2.35 and $11 million

verdicts respectively in cases involving defective discharges of the P320, months before Sig issued the Statement.

17.    But Sig's malice and bad faith in defaming plaintiff Bagnell goes much deeper than all the above prior knowledge that reasonable people - - not lying grifters seeking profit - - have found that the P320 can and has fired without a trigger pull.

18.    Sig itself has admitted in its own documents that the P320 can fail long before issuing the Statement in March 2025.

19.    In October 2018, for example, Sig filed a patent application (filed provisionally in October 2017) for a patent for a secondary sear notch to be added to the original version P320 sear:

[next page]



US 20190107353A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: US 2019/0107353 A1
Thomele et al. (43) Pub. Date: Apr. 11, 2019

(54) **HANDGUN SEAR WITH MULTIPLE ENGAGEMENT SURFACES**

(71) Applicant: **SIG SAUER, INC.**, Newington, NH (US)

(72) Inventors: **Adrian Thomele**, Stratham, NH (US); **Sean P. Toner**, Merrimack, NH (US); **Albert Richard Larochelle**, Manchester, NH (US); **Keith Andrew Carnicle**, Barrington, NH (US); **Mark Kimball**, Exeter, NH (US); **Andrew Philip Lariat**, Somersworth, NH (US); **Matthew Thomas Barker**, Epping, NH (US); **Derek A. Oaks**, Mamdinaire, NH (US); **Tyler Robert Thibodeau**, Clinton, NH (US); **Joshua Robert Shoemaker**, Rochester, NH (US); **Eric Raymond Guillemette**, Durham, NH (US); **Michael D. Couture**, Rochester, NH (US); **Zachary Messier**, Somersworth, NH (US); **Jacob Thomas Mawley**, Somersworth, NH (US); **David Steinke**, Epping, NH (US)

(73) Assignee: **SIG SAUER, INC.**, Newington, NH (US)

(21) Appl. No.: 16/156,266

(22) Filed: Oct. 10, 2018

**Related U.S. Application Data**

(60) Provisional application No. 62/570,628, filed on Oct. 10, 2017, provisional application No. 62/577,973, filed on Oct. 27, 2017.

**Publication Classification**

(51) **Int. Cl.**
| F41A 19/12 | (2006.01) |
| F41A 19/12 | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *F41A 19/12* (2013.01); *F41A 19/12* (2013.01)

(57) **ABSTRACT**

A handgun sear has a sear body extending between a proximal end portion and a distal end portion. The sear defines a first engagement surface adjacent the proximal end portion and a second engagement surface positioned distally of the first engagement surface. The sear can pivot about the initial and portions between a cocked position and a displaced position. The second engagement surface can be used to arrest forward movement of the striker in the event of an impulse that causes the striker to disengage from the first engagement surface. The sear may be incorporated into a fire control assembly of a semiautomatic handgun or other firearm.



20.    In this document Sig admits that the spring-charged striker foot *can be dislodged* from its proper

position in the event an impulse force is imposed on the gun.

21.    The Abstract for SIG's patent for "handgun sear with multiple engagement surfaces," states:

ABSTRACT

A handgun sear has a sear body extending between a proximal end portion to a distal end
portion. The sear defines a first engagement surface adjacent the proximal end portion
and a second engagement surface positioned distally of the first engagement surface. The
sear can pivot about the distal end portion between a cocked position and a displaced
position. The second engagement surface can be used **to arrest forward movement of the
striker in the event of an impulse that causes the striker to disengage from the first
engagement surface.** The sear may be incorporated into a fire control assembly of a
semiautomatic handgun or other firearm.

22.    Moreover, this was not Sig's only admission that an inertial force could cause a catastrophic

malfunction of the gun.

23.    On August 4, 2017, the same day it was sued by Bagnell in this District in the *Sheperis v. Sig

Sauer, Inc*. matter, it issued the following press release stating that ***vibration***, among other inertial

impacts, could make that connection fail:


[next page]



◄PR Contact:
Jordan Hunter
SIG SAUER, Inc
603-610-3203
jordan.hunter@sigsauer.com

FOR IMMEDIATE RELEASE

## SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017)** – In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

For more information on SIG SAUER, please visit us at sigsauer.com

Follow SIG SAUER on social media, including Facebook at facebook.com/sigsauerinc, Instagram at instagram.com/sigsauerinc, and YouTube at youtube.com/user/sigsauerinc.

**SIG SAUER, Inc.**

SIG SAUER, Inc. is The Complete Systems Provider™, leading the industry in American innovation, ingenuity, and manufacturing. SIG SAUER® brings a dedication to superior quality, ultimate reliability, and unmatched performance that has made it the brand of choice among many of the world's elite military, government and law enforcement users as well as responsible citizens. SIG SAUER offers a full array of products to meet any mission parameter, including handguns, rifles, ammunition, electro-optics, suppressors, ASP (Advanced Sport Pellet) airguns and training. The largest member of a worldwide business group of firearms manufacturers that includes SIG SAUER GmbH & Co. KG in Germany and Swiss Arms AG in

7

24.    Sig's Statement attributing dishonesty and profiteering is also completely belied by the enormous amount of prior incidents of the P320 defectively discharging over the last 10 years.

25.    All or almost all these incidents were reported to Sig long before it issued the Statement in March 2025.

26.    Many of these incidents inflicted serious injury or death on individuals who are trained in the use of firearms and hardly "anti-gun" individuals.

27.    More and more of these incidents have been caught on video and Sig is fully aware of these videos at the time it released its libelous statement in a further show of malice and bad faith:

 https://vimeo.com/1035626552/9a6b65d08f

28.    Plaintiffs attach as Exhibit 3 the lawsuit *in Currington et al. v. Sig Sauer, Inc*.  That lawsuit provides exhausting detail of the extent of Sig's internal knowledge that the P320 can fire without a trigger pull and hundreds of incidents in the country where that has happened.  Ex. 3.

29.    Defendant Sig was aware of all these hundreds of incidents at the time it issued the Statement defaming plaintiffs as dishonest, profit seeking grifters.

30.    Despite this knoweldge, Sig states in the Statement as a fact that the P320 "CANNOT, under any circumstances, discharge without a trigger pull," and characterized all allegations to the contrary as baseless, manufactured lies promoted by "grifters" and lying profiteers.

31.    These false statements were intended to discredit, shame, and intimidate Plaintiff and other legal professionals engaged in litigation against the company and harm their practices.

32.    On or about March 10. 2025, Plaintiffs, served a written demand for retraction upon Sig in accordance with Conn. Gen. Stat. § 52-237, providing clear notice of the defamatory nature of the statements and affording it 30 days to publish a correction or retraction.  Ex. 4.

33.    Defendant failed and refused to issue any correction, clarification, or retraction.

34.    Defendant's refusal to retract, despite receiving formal demand, constitutes additional

evidence of actual malice, willful intent, and a deliberate strategy to suppress criticism and mislead the public.

35.     As a result, Plaintiff Bagnell has suffered harm to his professional reputation, emotional distress, and loss of standing in the legal and broader community.

## COUNT ONE

### (Libel *Per Se* – Conn. Common Law & § 52-237)

36.     Plaintiff re-alleges and incorporates by reference Paragraphs 1–35 as if fully set forth herein.

37.     Defendant's statement falsely imputes to Plaintiff dishonesty, lack of professional integrity, and unethical conduct, constituting libel per se under Connecticut law.

38.     The statements were understood to refer to Plaintiff and were published without privilege.

39.     Plaintiff complied with Conn. Gen. Stat. § 52-237 by demanding retraction in writing and affording Defendant the full statutory period to respond. Defendant failed to publish a correction or retraction.

40.     Defendant's actions were taken with actual malice, knowledge of falsity, or reckless disregard for the truth.

41.     As a direct and proximate result, Plaintiff suffered presumed and actual damages, including reputational harm and emotional distress.

## COUNT TWO

### (Violation of Connecticut Unfair Trade Practices Act – CUTPA, Conn. Gen. Stat. § 42-110a et seq.)

42.     Plaintiff re-alleges and incorporates by reference Paragraphs 1–41 as if fully set forth herein.

43.     Defendant's public statement was issued in the course of trade or commerce and intended to suppress criticism of its P320 product by discrediting legal claims and attorneys.

44.     Defendant's categorical denial of known allegations, and branding of litigation efforts as "baseless," perpetrated by "grifters" employing "lies," was a deceptive act intended to mislead the

public, potential jurors, and deter future claims.

45.     Defendant's refusal to retract the false statement despite notice and opportunity under § 52-237 demonstrates an unethical, immoral, and unscrupulous business practice.

46.     These acts constitute unfair and deceptive practices in violation of Conn. Gen. Stat. § 42-110b.

47.     As a direct result, Plaintiff suffered an ascertainable loss, including harm to his business reputation and interference with his practice of law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

- Actual and compensatory damages in an amount not less than $5 million;

- Punitive damages in the amount of $15 million for willful bad faith and malice;

- Attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g; and

- Such other and further relief as the Court deems just and proper.

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,


JEFFREY S. BAGNELL, ESQ., LLC,

and JEFFREY S. BAGNELL,


_____/s/ John W. Madigan III

John W. Madigan, III

Federal Bar No. CT30969

30 Old King's Highway South Suite 215

Darien, Connecticut 06820

jwm3esq@gmail.com


*/s/ Jeffrey S. Bagnell*

Federal Bar No. CT18983

55 Post Road West

Suite 200

Westport CT 06880

jeff@bagnell-law.com

203 984 8820

Dated:  April 22, 2025