UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JEFFREY S. BAGNELL, | : | CIVIL ACTION NO.: |
| JEFFREY S. BAGNELL, ESQ., LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| SIG SAUER, INC., | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiffs, by and through undersigned counsel, states the following for their Complaint against defendant Sig Sauer, Inc. "("Sig" or "defendant"):

## PARTIES

1. Plaintiff Jeffrey S. Bagnell is an individual residing in the State of Connecticut and is a licensed attorney. Plaintiff Jeffrey S. Bagnell, Esq., LLC is his single member LLC.

2. Defendant Sig is a Delaware corporation with a principal place of business in New Hampshire and does business in the State of Connecticut.

## JURISDICTION AND VENUE

3. Jurisdiction is proper under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the defamatory publication was accessed in Connecticut, and Plaintiff Bagnell resides and practices law in this District.

**FACTUAL BACKGROUND**

A.    **March 7, 2025 "Truth About the P320" Statement**

5.    On or about March 7, 2025, defendant Sig, the world's third largest small arms manufacturer, published a statement on its Instagram, Facebook and public website pages titled "The Truth About the P320" (the "Statement"):

>*NEWINGTON, N.H., (March 7, 2025) – The P320 CANNOT, under any circumstances, discharge without a trigger pull – that is a fact. The allegations against the P320 are nothing more than individuals seeking to profit or avoid personal responsibility.*
>
>*Recently, anti-gun groups, members of the mainstream media, trial attorneys, and other uninformed and agenda-driven parties have launched attacks on one of SIG SAUER's most trusted, most tested, and most popular products – the P320 pistol. In all cases, these individuals have an ulterior motive behind their baseless allegations that the P320 can fire without a trigger pull; they have no evidence, no data and no empirical testing to support any of their claims. They instead choose to misrepresent clear, negligent discharges as a "design problem."*
>
>*In the decade since its introduction, the P320 has undergone the most rigorous testing and evaluation of any firearm, by military and law enforcement agencies around the world. It consistently delivers a proven record of performance and reliability through state-of-the-art engineering, and documented quality control at every stage of its production. Claims that unintended discharges are anything more than negligent handling and/or manufactured lies to support an anti-gun, anti-SIG agenda are false. Furthermore, lawsuits claiming that the P320 is capable of firing without the trigger being pulled have been dismissed in courtrooms around the country. In addition, multiple plaintiffs' so-called experts have conceded, it is not possible for the P320 to discharge unless the trigger is fully actuated.*
>
>*The rhetoric is high, and we can no longer stay silent while lawsuits run their course, and clickbait farming, engagement hacking grifters continue their campaign to highjack the truth for profit. Enough is enough.*
>
>*From the courts of law to the court of public opinion we will combat the lies and misinformation with the truth. SIG SAUER stands behind the quality, safety, and design of all our products – especially the P320.*
>
>*Industry, take notice; what's happening today to SIG SAUER with the anti-gun mob and their lawfare tactics will happen tomorrow at another firearms manufacturer, and then another.*
>*Today, for SIG SAUER – it ends.*

Ex. 1.

6.    This Statement was not issued in relation to any civil action filed by Sig; it was instead a standalone release to the public.

7.      Sig's Instagram account alone has 1.7 million followers. Its Facebook account has 1.1 million.

**B.      Defamatory Characterizations of Plaintiffs**

8.      The Statement referred to individuals involved in litigation over the P320 pistol, including "trial attorneys," and accused them of making "baseless allegations," being "engagement hacking grifters," willfully "misrepresenting" facts, spreading "manufactured lies" and "misinformation," "nothing more than individuals seeking to profit," and "highjackers" (sic) of "the truth for profit."

9.      That very small group of trial attorneys includes plaintiff Bagnell who has tried two of four jury trial cases against Sig as well as the first jury trial involving the P320.

10.     The Cambridge Dictionary definition of "grifter" is one who "gets money dishonestly by tricking people."  https://dictionary.cambridge.org/us/dictionary/english/grifter#

11.     In a word, the Statement calls plaintiff Bagnell, and other attorneys advocating on behalf of P320 victims, intentionally dishonest and unethical.  This is libel *per se* - - attributing improper conduct and a lack of integrity in one's trade or profession to the public.

**C.      Bagnell's Representation of P320 Victims Since 2017**

10.     Plaintiff Bagnell is a trial attorney who since June 2017 has represented and currently represents federal and state law enforcement and civilian clients in active litigation against Sig involving the P320 pistol.  He is reasonably understood by the public to be one of the attorneys, if not the primary attorney, referenced in the post.

11.     He has practiced for 32 years with no substantive discipline of any kind his entire career.  He has received numerous peer reviewed honors and awards.  A 59-page Affidavit attached as Exhibit 2 details his education and professional background as well as his pioneering and extensive advocacy on behalf of P320 victims around the country.

12.     He is the first attorney in the nation to bring Sig to trial for a defective discharge of a P320 that severed his client Deputy Sheriff Marcie Vadnais's femur in half in February 2018.

13.     Instead of taking a verdict in that case on the grounds that it is "impossible" for the P320 to

3

malfunction, Sig settled on the second day of a jury trial in the Eastern District of Virginia. *Vadnais v. Sig Sauer, Inc.*, 1:18-cv-00540 (EDVA). Its earlier summary judgment and Daubert motions had been summarily denied from the bench.

14. Previously in this District, Sig settled a case involving Bagnell's client Vincent Sheperis, a Stamford SWAT officer whose P320 drop fired from three feet without a trigger pull - - despite Sig's assurances that the P320 was drop safe and would not fire if dropped. The bullet struck Sheperis in his knee. *Sheperis v. Sig Sauer, Inc.*, 3:17-cv-01318 (D. Conn.).

D.   **Sig's Awareness of P320 Discharge Incidents**

15. Defendant knew, at the time of publication of the Statement, of these and at least fifteen other lawsuits filed across the country, on behalf of almost 100 law enforcement and civilian plaintiffs, alleging that the P320 can discharge without a trigger pull.

16. These discharge incidents routinely cause severe injuries and even death and many if not most of the victims are traumatized for life.

17. Many of these lawsuits survived dispositive summary judgment and *Daubert* motions, were settled (including *Vadnais, Sheperis, Catato v. Sig, Hoefs v. Sig, Hartley v. Sig,* and others), and involved sworn testimony and expert reports contradicting Sig's blanket "impossibility" claim.

E.   **Judicial Findings Pre-Dating the Statement**

18. Indeed, before Sig issued the Statement, it was fully aware that a federal judge had already rejected, in September 2022, the assertion that it is impossible for the P320 to fire without a trigger pull:

> *"The court found Guay credible in every respect. Specifically, the court credits Guay's testimony that the gun was still fully inside the holster when it discharged. With the gun fully in the holster, Guay could not have accessed the trigger; it would have been impossible for him to have accidentally pulled it. Moreover, as expert testimony revealed, the P320 had a 6.7 pound trigger, meaning that to fire, the user had to exert 6.7 pounds of pressure. The court does not believe that Guay could have applied that amount of force to the trigger inadvertently while the gun was in the holster".*

19. The court further found Sig's experts' testimony unpersuasive:

> *To the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive. As discussed, the court found credible Guay's testimony that he did not pull the trigger, and the video of the Roscommon incident was persuasive in showing that a P320 can fire without a trigger pull. Furthermore, Watkins admitted that—despite having read the numerous allegations of misfires (without a trigger pull) in the complaint—he did not deem them worthy of mention in his expert report. And Toner testified that he found such misfire allegations unworthy of investigation. Had Watkins and Toner been less dismissive of these allegations, the court may have found their testimony more credible.*

*Guay v. Sig Sauer, Inc.*, 626 F. Supp. 3d 536, fn. 2. (D. NH)

20.     In June and November 2024, federal and state juries returned $2.35 and $11 million verdicts, respectively, against Sig in cases involving defective discharges of the P320, just months before Sig issued the Statement.

21.     In short, there has never been a single judicial finding of "dishonesty," "willful misrepresentation," or "grifting" by plaintiff Bagnell in any case over the last eight years.[1] His advocacy in these high degree of difficulty cases has undoubtedly prevented other severe injuries and deaths of law enforcement officers and civilians.

22.     Almost twenty law enforcement agencies have now outright banned the Sig P320 from use, including: the Milwaukee Police Department (2023); the Dallas Police Department (2017); the Montville Connecticut Police Department (2023); the East Lyme Police Department (2024); the

---

[1]     Sig, on the other hand, came very close to having the Sheperis case reopened due to discovery fraud. It mainly avoided it due the lapse of time between the settlement and time of discovery: "[i]n the instant case, the alleged fraud is Sig's nondisclosure of additional drop fire events. This is precisely the kind of fraud that caused injury to Sheperis, a single litigant." *Sheperis v. Sig Sauer, Inc.*, Case 3:17-cv-01318-JCH, Docket No. 78, p. 7 (holding that the discovery fraud claim was time barred). And in 2019 a German court found that both Sig and its CEO were guilty of falsifying export certificates involving the true destination of certain Sig firearms. Sig was fined $12 million and its CEO over $1 million - - in addition to a 22-month suspended prison sentence for fraud. https://www.nhpr.org/nh-news/2019-02-28/reports-sig-sauer-ceo-takes-plea-deal-in-german-arms-case#

Pierce County Washington Police Department (2023); the Washington State Criminal Justice Training Commission (2025); the Vancouver Washington Police Department (2024); the SEPTA transit police in Philadelphia (2019); the Stamford Connecticut SWAT department (2017); the Pasco County Florida Sheriff's Department (2022); the Indian River Florida Sheriff's Department (2023); the Austin Texas Police Department (2024), among others.

23. Sig was aware of this fact at the time it issued the Statement claiming it was impossible for the P320 to fire without a trigger pull and maligning plaintiffs as dishonest.

**F.**     **Internal Admissions of P320 Defects**

24. But Sig's malice and bad faith in defaming plaintiff Bagnell goes much deeper than all the above prior knowledge it had pre-dating the Statement that reasonable people, including a federal judge, have already found that the P320 can and has fired without a trigger pull.

25. Sig *itself* has admitted in its own documents that the P320 can fail long before issuing the Statement in March 2025.

26. In October 2018, for example, Sig filed a patent application (filed provisionally in October 2017) for a patent for a secondary sear notch to be added to the original version P320 sear:

[next page]



US 2019/0107353A1

# United States
## Patent Application Publication
Thomele et al.

(10) Pub. No.: US 2019/0107353 A1
(43) Pub. Date: **Apr. 11, 2019**

(54) **HANDGUN SEAR WITH MULTIPLE ENGAGEMENT SURFACES**

(71) Applicant: **SIG SAUER, INC.**, Newington, NH (US)

(72) Inventors: **Adrian Thomele**, Stratham, NH (US); **Sean P. Toner**, Merrimack, NH (US); **Albert Richard Larochelle**, Manchester, NH (US); **Keith Andrew Cornish**, Barrington, NH (US); **Mark Kimball**, Exeter, NH (US); **Andrew Phillip Loriot**, Somersworth, NH (US); **Matthew Thomas Barker**, Epping, NH (US); **Derek A. Oaks**, Mamdusian, NH (US); **Tyler Robert Thibodeau**, Clinton, NH (US); **Joshua Robert Shoemaker**, Rochester, NH (US); **Eric Raymond Guillemette**, Durham, NH (US); **Michael D. Couture**, Rochester, NH (US); **Zachary Messier**, Somersworth, NH (US); **Jacob Thomas Slawsby**, Somersworth, NH (US); **David Steinke**, Epping, NH (US)

(73) Assignee: **SIG SAUER, INC.**, Newington, NH (US)

(21) Appl. No.: 16/156,266

(22) Filed: Oct. 10, 2018

### Related U.S. Application Data

(60) Provisional application No. 62/570,625, filed on Oct. 10, 2017, provisional application No. 62/577,073, filed on Dec. 27, 2017.

### Publication Classification

(51) **Int. Cl.**
 *F41A 19/12* (2006.01)
 *F41A 19/12* (2006.01)

(52) **U.S. Cl.**
 CPC ........ *F41A 19/12* (2013.01); *F41A 19/12* (2013.01)

(57) **ABSTRACT**

A handgun sear has a sear body extending between a proximal end portion and a distal end portion. The sear defines a first engagement surface adjacent the proximal end portion and a second engagement surface positioned distally of the first engagement surface. The sear can pivot about the distal end portion between a cocked position and a displaced position. The second engagement surface can be used to arrest forward movement of the striker in the event of an impetus that causes the striker to disengage from the first engagement surface. The sear may be incorporated into a fire control assembly of a semiautomatic handgun or other firearm.



27.     In this document Sig admits that the spring-charged striker foot *can be dislodged* from its proper position in the event an impulse force is imposed on the gun.

28.     The Abstract for SIG's patent for "handgun sear with multiple engagement surfaces," states:

ABSTRACT

A handgun sear has a sear body extending between a proximal end portion to a distal end portion. The sear defines a first engagement surface adjacent the proximal end portion and a second engagement surface positioned distally of the first engagement surface. The sear can pivot about the distal end portion between a cocked position and a displaced position. The second engagement surface can be used **to arrest forward movement of the striker in the event of an impulse that causes the striker to disengage from the first engagement surface.** The sear may be incorporated into a fire control assembly of a semiautomatic handgun or other firearm.

29.     Moreover, this was not Sig's only admission that an inertial force could cause a catastrophic malfunction of the gun.

30.     On August 4, 2017, the same day it was sued by Bagnell in this District in the *Sheperis v. Sig Sauer, Inc*. matter, it issued the following press release stating that ***vibration***, among other inertial impacts, could make that connection fail:

[next page]

**SIG SAUER**

PR Contact:
Jordan Hunter
SIG SAUER, Inc.
603-610-3293
jordan.hunter@sigsauer.com

FOR IMMEDIATE RELEASE

## SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

Newington, NH (August 4, 2017) – In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

For more information on SIG SAUER, please visit us at sigsauer.com.

Follow SIG SAUER on social media, including Facebook at facebook.com/sigsauerinc, Instagram at instagram.com/sigsauerinc, and YouTube at youtube.com/user/sigsauerinc.

**SIG SAUER, Inc.**

SIG SAUER, Inc. is The Complete Systems Provider™, leading the industry in American innovation, ingenuity, and manufacturing. SIG SAUER® brings a dedication to superior quality, ultimate reliability, and unmatched performance that has made it the brand of choice among many of the world's elite military, government and law enforcement units as well as responsible citizens. SIG SAUER offers a full array of products to meet any mission parameter, including handguns, rifles, ammunition, electro-optics, suppressors, ASP (Advanced Sport Pellet) airguns and training. The largest member of a worldwide business group of firearms manufacturers that includes SIG SAUER GmbH & Co. KG in Germany and Swiss Arms AG, a

31.     Sig has also recently amended the P320 user manual to caution users against carrying the P320 with a chambered round - - precisely how all American law enforcement agencies, state and federal, carry - - and that mere "impact" to the gun can cause an un-commanded discharge.



**WARNINGS**

**2.1 ABUSIVE HANDLING**

SIG SAUER firearms incorporate effective mechanical safeties. However, like any mechanical device, exposure to abusive conditions may harm these safety mechanisms and cause them to fail to work as designed. Do not subject the SIG SAUER firearm to any abusive handling. This includes the firearm being dropped, impact to the firearm, or the firearm being struck by another object. Always maintain control of the firearm. If the firearm suffers an abusive event such as previously described, or experiences a malfunction, do not attempt to use the firearm. Keep the firearm pointed in a safe direction, unload and clear the firearm of all ammunition immediately, and have it inspected by a certified SIG SAUER armorer before using the firearm.

ALWAYS keep the firearm pointed in a safe direction. A safe direction is defined as an area where, if the firearm were to discharge, no property damage would occur, and no personal injury would result.

As previously noted, if the SIG SAUER firearm suffers an abusive event, unload it immediately and have it inspected by a certified SIG SAUER Armorer prior to using the firearm. If the firearm suffers an abusive event during a life-threatening/self-defense situation, follow the steps below immediately:

1. Pulling the slide entirely rearward to eject the chambered cartridge.
2. Releasing the slide to chamber a new cartridge and resetting the trigger mechanism. (Do not ride the slide forward.)
3. The firearm should now be returned to proper operational condition.

32.     This change further evidences internal knowledge on the part of Sig that the P320 can in fact fire without a trigger pull due to its fully cocked, spring-charged single action design.  Sig also expressly warrants that the P320 is drop safe consistent with industry regulations (e.g., SAAMI)

10

*require* pistols to be drop safe from a distance of at least four feet.[2]

### G. Vast Scope of Known P320 Defective Discharge Incidents and Video Evidence

33. Sig's Statement attributing dishonesty and profiteering is also completely belied by the enormous amount of prior incidents of the P320 defectively discharging over the last 10 years.

34. All or almost all these incidents were reported to Sig long before it issued the Statement in March 2025.

35. Many of these incidents inflicted serious injury or death on individuals who are trained in the use of firearms and hardly "anti-gun" individuals.

36. More and more of these incidents have been caught on video and Sig is fully aware of these videos at the time it released its libelous statement in a further show of malice and bad faith:

https://vimeo.com/1035626552/9a6b65d08f

37. For the sake of brevity, plaintiffs attach as Exhibit 3 the lawsuit *in Currington et al. v. Sig Sauer, Inc*. That lawsuit provides exhausting detail of the extent of Sig's internal knowledge of nationwide allegations that the P320 can fire without a trigger pull. Ex. 3.

38. Defendant Sig was aware of all these hundreds of incidents at the time it issued the Statement defaming plaintiffs as dishonest, profit seeking grifters.

39. Despite this knowledge, Sig states in the Statement as a fact that the P320 "CANNOT, under any circumstances, discharge without a trigger pull," and characterized all allegations to the contrary as baseless, manufactured lies promoted by "grifters" and lying profiteers.

40. These false statements were intended to discredit, shame, and intimidate Plaintiffs and other legal professionals engaged in litigation against the company and harm their practices.

41. On or about March 10, 2025, Plaintiffs, served a written demand for retraction upon Sig in accordance with Conn. Gen. Stat. § 52-237, providing clear notice of the defamatory nature of

---

[2] "5.1.2. With the firearm in the "Safe Carrying" condition, the firearm shall be capable of passing the below test criteria for drop testing from a height of four (4) feet (1.22 m) onto the Drop Test Surface."

11

the statements and affording it 30 days to publish a correction or retraction. Ex. 4.

42. Defendant failed and refused to issue any correction, clarification, or retraction.

43. Defendant's refusal to retract, despite receiving formal demand, constitutes additional evidence of actual malice, willful intent, and a deliberate strategy to suppress criticism and mislead the public.

44. As a result, Plaintiff Bagnell has suffered harm to his professional reputation, emotional distress, and loss of standing in the legal and broader community.

## COUNT ONE

### (Libel *Per Se* – Conn. Common Law & § 52-237)

45. Plaintiff re-alleges and incorporates by reference Paragraphs 1–44 as if fully set forth herein.

46. Defendant's statement falsely imputes to Plaintiff dishonesty, lack of professional integrity, and unethical conduct, constituting libel per se under Connecticut law.

47. The statements were understood to refer to Plaintiff and were published without privilege.

48. Plaintiff complied with Conn. Gen. Stat. § 52-237 by demanding retraction in writing and affording Defendant the full statutory period to respond. Defendant failed to publish a correction or retraction.

49. Defendant's actions were taken with actual malice, knowledge of falsity, or reckless disregard for the truth and are part of a long pattern of attempting to silence him and destroy his practice, including a *de facto,* vexatious SLAPP suit pre-dating the Statement designed to interfere with his trial preparation in Guay v. Sig Sauer, Inc.

50. As a direct and proximate result, Plaintiff suffered presumed and actual damages, including reputational harm and emotional distress.

## COUNT TWO

### (Violation of Connecticut Unfair Trade Practices Act – CUTPA, Conn. Gen. Stat. § 42-110a et seq.)

51. Plaintiff re-alleges and incorporates by reference Paragraphs 1–48 as if fully set forth herein.

52. Defendant's public statement was issued in the course of trade or commerce and intended to suppress criticism of its P320 product by discrediting legal claims and attorneys.

53. Defendant's categorical denial of known allegations, and branding of litigation efforts as "baseless," perpetrated by "grifters" employing "lies," was a deceptive act intended to mislead the public, potential jurors, and deter future claims.

54. Defendant's refusal to retract the false statement despite notice and opportunity under § 52-237 demonstrates an unethical, immoral, and unscrupulous business practice.

55. These acts constitute unfair and deceptive practices in violation of Conn. Gen. Stat. § 42-110b.

56. As a direct result, Plaintiff suffered an ascertainable loss, including harm to his business reputation and interference with his practice of law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

1. Actual and compensatory damages in an amount not less than $5 million;

2. Punitive damages in the amount of $15 million for willful bad faith and malice;

3. Attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g;

4. A mandatory injunction requiring to Sig to retract the Statement; and

5. Such other and further relief as the Court deems just and proper.


Plaintiff demands a trial by jury on all issues so triable.

        Respectfully submitted,


        JEFFREY S. BAGNELL, ESQ., LLC,

        and JEFFREY S. BAGNELL,


        _____/s/ John W. Madigan III

        John W. Madigan, III

        Federal Bar No. CT30969

        30 Old King's Highway South Suite 215

        Darien, Connecticut 06820

        jwm3esq@gmail.com

          */s/ Jeffrey S. Bagnell*

          Federal Bar No. CT18983

          55 Post Road West

          Suite 200

          Westport CT 06880

          jeff@bagnell-law.com

          203 984 8820

Dated:  April 25, 2025